Our final case of the morning is number 20-13581, Reynolds v. Mintz, Levin, Cohn, P.C. We have Mr. Smith and Mr. Gilchrist. Mr. Smith, you may proceed. Thank you, Your Honor. May it please the court, Richard Smith on behalf of the trustee for Bight Brook State, Therapeutic. Athertech Incorporated at one time employed over 350 employees in its offices in Birmingham. Today, Athertech employs no one because Athertech filed bankruptcy in March 2016. Mintz, Levin contributed to Athertech's demise by providing inadequate and unreasonable advice. In response to a simple, specific question asked by Athertech to Mintz, Levin, should we continue paying process and handling fees, or should we stop? The district court erred in taking the decision from the jury by granting Mintz, Levin's motion for summary judgment whether it was a genuinely disputed issue of material fact presented in the motion for summary judgment proceedings as to whether Mintz, Levin's advice was adequate and reasonable. Despite Athertech's submission of expert testimony, which testimony was not challenged by dollar motion or restricted in any way. Athertech's experts, Mr. Barber and retired Alabama Supreme Court Justice Bernard Harwood, opined that Mintz, Levin did not meet the standard of care, did not answer the question adequately and reasonably, and further opined that the advice given by Mintz, Levin was not reasonable and directly caused damage to Athertech. While that testimony was contradicted by Mintz, Levin's experts, nevertheless, the conflicting expert testimony created a disputed issue of material fact, particularly when all reasonable inferences were given to Athertech, the non-moving party. Counsel, did Mr. Barber testify when asked, quote, would you agree that the lawyer's duty is to carefully examine a client's practice and then make an assessment of the risk and then advise the client of the lawyer's judgment so the client can make an informed decision? Answer. I think that's exactly what I said the methodology should be. Yes, your honor. Given that given that testimony, I'm going to let you respond. But given that test, my question is, given that testimony and given that it seems undisputed that that's what happened here. In other words, that the question was asked of counsel and counsel at a board meeting and elsewhere, told the board the risks and rewards for each of the potential options that were given. Isn't that consistent with the methodology testified to by Mr. Barger in his deposition? Your honor, he did say that, but that was not all of his legal opinion. Mr. Barger's expert report and deposition testimony provided that there is a standard of care to be followed by a reasonably proven health care regulatory attorney. And you should note at this point that Alabama has an Alabama Legal Services Act. The Alabama Supreme Court has repeatedly said that the Alabama Legal Services Act does not apply to lawyers practicing law in Alabama who are not members of the Alabama Bar. These situations, such as in this case, where no member of its level is a member of the Alabama Bar. The Alabama Legal Services Act does not apply to provide protections under the act. It's standard reversed by simple negligence. Well, let me let me ask you this. There's no doubt that a negligent standard applies. But but I think there is an open question on duty. And and as I understand it, under Alabama law, and please correct me if I'm wrong, because I am certainly no expert on Alabama malpractice law, that where there's an unsettled question. The duty of a lawyer is different and less onerous than if it's a settled question of law. Do you agree with that that that that principle of law exists in general? I do, Your Honor. But the problem is, is that there remains a standard of care that Mr. Barger and retired Justice Harwood said that a lawyer must meet, that there may be questions of law where the law is unclear emergency. But even in those circumstances, a reasonably prudent lawyer must follow the standard of care if it applies. And if there is a a negligent standard, then the question is one of history duty was to be breached and damages resulting. Do you agree that the question here was unsettled? No, Your Honor, we do not agree with that. Let me let me ask you this more fundamentally. Is that a question of law for the court to decide? Or was that a question of fact for a jury to decide whether the law and the federal law on processing and handling fees in under the federal kickback statute was settled or not? There are multiple cases, Your Honor, to talk about that questions of malpractice, whether it be legal doctor, nurses, hospitals, etc. Typically and generally are questions of fact, unless there is an undisputed question that there are no disputed issues. That's certainly true of breach, but in setting the duty, which is generally a legal issue, and whether whether the duty is affected by whether an underlying legal question is unsettled or not. That would seem to be a question of law for the court that would initially have to decide to instruct the jury on what the proper standard of care is correct. But the problem here, Your Honor, is that the question was not unsettled as to what the standard of care was. There was plenty of guidance from previous OIG advisory opinions and special fraud alerts as to what was required. How's that possible where the statute itself says that as long as three things are met, it's in writing, it's for fair value, and it's not payment for volume or value of the referral that the safe harbor applies. In other words, how how is someone to know that if I pay fair market value for service and I'm not paying for volume or value that that you don't need or or it isn't OK when OIG never ever said that processing and handling fees were not for fair market value were illegal and could still violate as long as there was an intent to intend to steer services? Well, if we look back at the special fraud alert issued in October 1994, which was quoted in the special fraud alert of June 2014 and referenced by Mr. Barger. But the key there is you just read it as the below market. If it's fair market value, which which there's as I understand, there's no dispute that the payment here was payment for fair market value for processing and handling by doctors. What would put them on notice from that what you just read that that is inappropriate, especially where the kickback statute as a safe harbor for paying fair market value for services, not based on volume based on volume. The question that is that there is a dispute about the payment of the process and handling fees. The blood draw fee of three dollars has been established going back to the 1980s. Medicare says that a physician will get a three dollar blood draw fee or taking a blood draw. The process and handling of that blood draw fee is a bundled service that is paid to the doctor through administrative overhead. And our expert, Catherine McNamara, made that clear that it is a bundled service that the doctor is paid for. And if you pay anything above the three dollars for process and handling, then you are not paying fair market value. So that is the dispute there, Your Honor, is that there is a disputed issue of fact as to whether payment of any process handling fees is appropriate. That's a separate question from whether whether OIG or or HHS or federal statute or regulation prohibited the practice and whether that was settled or not. Because the 1994 opinion letter that you just gave did not speak to that issue as far as I understand it. Was there anything else before the 2014 letter, the one that ultimately caused them to stop that that would have triggered or made this a settled issue? Yes, there was also an advisory opinion from the Department of Justice in 2011 that addressed the same question. And that is, if you are paying anything of value above fair market value, in this case, the three dollars for the blood draw fee is the fair market value. Anything above that is bundled in and paid for in the administrative overhead of the doctor's office. And in fact, there are cases that Mr. Barger relied on as well. A greater case from Third Circuit and the Davis case from Fifth Circuit. We cited that courts interpreting the anti-kickback statute have long held that payments made to doctors who refer federal health care beneficiaries can violate the anti-kickback statute. Even if payments primarily intended to compensate doctors for professional services, the three dollar blood fee. The Davis case goes on to say that even if one purpose of such payments is to induce referrals, services which may be paid by federal health care programs, then the payment arrangement violates the anti-kickback statute. It's our position, Your Honor, that no payment above the three dollars would have been appropriate in these circumstances. Can I ask you a question about, just to clarify something for me, your position is that the breach of duty here was that the lawyer did not specifically advise the client to stop paying the fee. Is that right? That is correct, Justice Brasher. It's undisputed that Vince Levin never told a therapeutic to stop making P&H payments at any point during its engagement from the beginning of 2011 through the end of its engagement in April 2016. Here's the follow-up question I have on that. Let's go to causation, I guess, is my question on that. Why would we think that the lawyer failing to give that advice mattered at all to the company, given that the company continued to pay the fee even after the fraud alert? I'm sorry, not after the fraud alert, but even after they were sued in a Ketam action, I believe. Well, Your Honor, they were not aware of the Ketam action until it was unsealed in 2016. The company quit paying after the fraud alert was issued in June 2014, not because Vince Levin told them to stop, but because they looked at the special fraud alert and said, this appears to tell us we are violating the law. Counsel, to Judge Brasher's point, what I think he's referring to is DOJ notified that they were investigating criminal charges in January of 2014, and they did not stop. And as I understand the deposition testimony, Judge Breyer, is it okay if I continue? Yes. As I understand the deposition testimony, all the corporate officers testified that we were going to pay this thing to be competitive until DOJ shut this down. Wasn't that the evidence? Because Vince Levin told them that it was appropriate to do so. Throughout this engagement, Vince Levin... Okay, I guess that's a different issue. Where did Vince Levin specifically tell them they could pay the fee? That seems like a different malpractice claim. What they told them was, in two different times, Ms. Foster, who is the lead attorney for Vince Levin, told the Theratech management that she had found language, this is in 2011, which reportedly protected Athertech from liability for payment of P&H fees. Then in 2013, Ms. Levin reviewed, edited, and approved language for use by Athertech's sales force, saying that Athertech believed its claimant of P&H fees was in compliance to start any kickback statutes. So while they didn't specifically tell them, yes, make the payments, there was certainly an effort to minimize the risk and undisputed that they didn't tell them to stop making the payments, which is what Mr. Barger says was the first and foremost step to be taken by a reasonable health care attorney. I see my time is up. Thank you, Mr. Smith. We'll give you your full time for rebuttal since you are answering our questions. Mr. Gilchrist. Okay, please, the court. Following more than a century of Alabama legal malpractice case law, the trial court correctly held that no reasonable jury could find that Ms. Levin's advice was unreasonable. The trial court based its decision on, among other things, the undisputed facts that Ms. Levin advised Athertech of the risks of its own conduct, as well as the options that Ms. Levin presented for addressing Athertech's competitor, HDL. The undisputed testimony from Athertech's CEO, Mike Mullen, the CEO of the company, is that having been advised of the risks by Ms. Levin's attorney, Hope Foster, Athertech's board and management made a business decision to continue paying P&H fees and also to report HDL's conduct to DOJ. Mr. Mullen testified that in doing so, Athertech was fully aware that it invited DOJ's scrutiny into its own conduct. The trial court expressly addressed the expert testimony offered by the trustee, and the court correctly held that because the state of the law with respect to P&H fees was unsettled in 2011, Ms. Levin was not required to tell Athertech to stop paying P&H fees, as the trustee's expert, Mr. Carver, suggests. At that time, there was no case law, no regulation, and not even any sub-regulatory guidance applying the anti-kickback statute to P&H fees. The trustee in its briefing below and to this court and Mr. Barber in his report and deposition have never presented any such law as of 2011. This court can affirm on any one of three grounds. Counsel, before you get there, just on that last point, is this a matter of fact or law? In other words, let's assume for the moment that Mr. Barger did explicitly state that this is settled. He opines that it is settled based on fact one, two, and three and reaches the conclusion this is a settled area of the law. You come with your expert and say no, this is unsettled. Is that a fact question that needs to be determined by a jury or does the court determine that because the basis of that determination goes to the legal question of what duty applies and the standard of care that applies? It goes to the duty question, Your Honor. This is very much bound up in the duty analysis, and it is the core function of the court to decide questions of law, and duty is a question of law. And whether or not the law is unsettled is also a question of law, isn't it? That's correct, Judge Pryor. I cannot imagine how the court would go about giving a jury instruction on how to decide the law. That is not the function of the jury. It is the function of the court to decide the law, and many courts have so held. We cite the Taylor Court from the 10th Circuit, and many Florida courts are on this issue, which we've also held. So let's assume for the moment that it's a matter of law. Let's assume for the moment that I agree with you that my reading of the OIG letters and regulations state that the law, at least as to this narrow issue, is unsettled. What does that do for the duty here? How does that change the standard of care that needs to be applied to a reasonable health care attorney? The standard of care is for an attorney to exercise reasonable care and skill. So the attorney needs to know the law as it exists at the time, apply it to the facts, and inform the client. In informing the client, the attorney's obligation is to do exactly what Hope Foster did, which is to advise the client of the pros and cons of different courses of action and the risks of the conduct involved. And that is exactly what Hope Foster did. That is exactly what the CEO and chief compliance officer testified, as well as the former director, Mr. Visser. And so under Alabama law, again, this is more than a century of law, that while one's advice may be wrong, it may nevertheless be reasonable. And that an attorney is not answerable for an error in judgment upon points of new occurrence or doubtful construction, which is exactly what this is. So on the standard of care issue, which is a jury issue, what do we do with the expert testimonies, the expert testimony and reports that seem to suggest or state that the standard of care, based on the same evidence that you're talking about, was breached? Whether that's right or not is a separate point. What do we make of that dispute? Regardless, you have lawyers on both sides who have their opinions of what the law is, but it is still for the court to decide what the law is. Well, I'm not talking about the legal issue now. We're beyond that. I'm talking about the application of law, the standard of care that you articulated. That, as I understand it, is a jury issue, and you have experts on your opposing counsel's side which state that, based on the standard of care, what happened here did not meet it for various reasons. Your experts have opined contrary to that. Is that not a classic jury issue for the jury to decide? The issue of the basic standard of care, which is to bring reasonable care and skill to the table, you essentially have both lawyers agreeing, and Mr. Barker agreeing, from the testimony that you quoted, that that is the correct standard to apply. The only way the standard of care can ever get to the point of requiring a lawyer to specifically instruct the client on a course of conduct is if the law is settled, that it clearly requires the conduct to do something either to do something or to do something different from what the client is doing. In that case, the lawyer should be aware of that law and should give that advice or at least give the advice that the risk of not doing so could be adverse for various reasons. But the question of whether that law is unsettled or settled, as the case may be, is still for the court to decide. Let me get past breach for a second and get to the question that Judge Brasher asked you about or asked that your opposing counsel about, which is causation. So was there just any dispute? Is there any testimony in favor of your opposing side that the company would have made a different decision had it been advised better or more or more clearly by the law firm? There's no evidence of that at all, and the evidence is to the contrary. Mr. Mullen, again, he's the CEO of this company, so no one would know better than he. He testified that Foster told the Theratex board of management that there were always risks in paying providers and that the only way to eliminate the risk was to stop but that the company made the business decision, which is what the client's role in this relationship is, is to receive advice and make a business decision. Did he testify that he would have made the same decision even if he had been told to stop or even? No, your honor. He did not testify to that. There's no evidence on that specific point. But the evidence suggests to the contrary that being fully advised of the risks, they made the business decision to continue. I understood from the briefs and the record, I guess, and maybe this is my gloss on it, but that they would have gone bankrupt even earlier had they just stopped paying these P&H fees because then they would have been at a serious competitive disadvantage with everybody else that was paying them. Your honor, I wrote that down when Mr. Smith said that. There is no evidence in this record that a Theratex bankruptcy resulted from the failure to stop paying P&H fees or that it would have gone bankrupt earlier if it had stopped paying earlier. The only evidence in the record is Mr. Visser's testimony that coincidentally after the special fraud alert came out in June of 2014 and the company stopped paying the P&H fees, two other things happened. Quest, the company's biggest customer, decided to stop using a Theratex test, and that was a major hit to the bottom line. And UnitedHealthcare, another customer, stopped sending business to a Theratex. Those were the drivers of the economic demise of this company, and that's the only evidence on that point. So we don't know from the record whether the P&H fees had anything to do with that at all or whether it was a customer service issue or why that happened? None of that evidence was developed by the trustee. Let me ask you, Mr. Gilchrist, about an argument that the trustee made here today, and I didn't see a response to it in your brief. But the argument is that it was settled law that the P&H fees were improper because CMS had a CPT code for doctors to report the work involved in preparing a specimen for a laboratory. And so the idea is that the physician could submit this code for overhead expenses, including the P&H services, and receive reimbursement through a bundled payment. So it would be like paying the physicians for drawing blood when they're already able to be reimbursed by Medicare. What's your response to that argument? The 2014 special fraud alert was the first time the government had ever issued any sort of guidance on how CPT code 99,000 operated. And certainly there was no law at all or even sub-regulatory guidance that had reached that conclusion or even indicated that that was a possible consideration. So your argument is before 2014, nobody knew that that was a possible response, that that was something you could do, that it would be sort of a double payment. That's correct. And Hope Foster, who is a leading practitioner in this field, a leading practitioner in this field going back to the 80s, she testified that she was shocked by that conclusion. What about the Fifth Circuit case your opposing counsel cited when I asked him about whether the law was settled? That's not a case that I'm familiar with, Judge Luck, candidly, but there is not a decision on point, and certainly was not in 2011, with respect to the payment of P&H fees. There is not a litigated case with respect to P&H fees as of 2011. On the causation issue, which Judge Brasher asked about, I would make two points there. First, I'll make several points. I think this is both a failure of causation and a failure of damages, and there's simply no causal link between the alleged malpractice, the failure to advise a theoretic to stop paying, and the damages they see. In the trial court, the trustee had made noise about, and it's pleaded in the complaint, that there was this huge contingent liability out there. But as this case is preceded, they have windowed that damage claim, and the only damages that they are claiming as of now in this appeal are the fees paid to Ms. Levin for responding to the DOJ investigation, which began in September of 2012. But there is no—what is required under Alabama law in the malpractice setting is that there be but-for causation, meaning that but-for the failure to advise a theoretic to stop paying, a theoretic would not have had to pay Ms. Levin those fees. But what we know from the facts are that the investigation only began after the Ketam actions were filed earlier in 2012, and it's the government's statutory obligation to investigate after a Ketam action is filed. So there is no causal link between the alleged failure to give the advice to stop paying the fees and the damages that are being solved here. There's zero connection. And additionally, a theoretic had paid the P&H fees before Ms. Levin came on the scene. So there is still a basis for the Ketam actions allegedly, and then therefore the investigation itself. I also—and then the flip side of the causation point is that there are no damages being solved from the actual alleged malpractice, the allegation that they should have told a theoretic to stop paying the fees. There is no—has been no damage to the company for failing to stop paying these fees. None. A theoretic has never paid a penny to anyone as a result of failing to stop paying the fees. That never—has never happened. Let me ask you to address something really quickly here. I was sort of surprised to hear your friend on the other side say that the problem here was advice given to continue paying the fees or that it was safe to pay the fees or that they could continue paying. What do you say about that claim? Judge Rusher, there was no advice given other than this conduct is—has risks. And Hope Foster specifically further advised the company that this conduct was not within an anti-kickback safe harbor. That is the only credible evidence of what meant—what Hope Foster and Mintz Levin advised the client with respect to this conduct is that it was—there was risk involved. It was not within a safe harbor. And I'm sorry, Judge Breyer, my time—my time has expired. May I go briefly? Yes. And then the—and then finally, the undisputed evidence is that the board and management of this company was fully aware of its conduct. It had been paying these fees for years. It was fully aware of the risks of its conduct and of also the options that Hope Foster presented. In addition to the grounds that the trial court reached, this court can affirm for lack of causation, lack of damages, and also on the defenses of Imperial Delicto and the Hinkle Rule, which are addressed in our brief. Thank you. Thank you, Mr. Gilchrist. Mr. Smith, rebuttal. Thank you, Your Honor. Judge Luck, you asked the question, is there any evidence that a therapeutic would have done anything different had Mintz Levin given the advice to stop? Mr. Visser said in his deposition, which was in the record before the trial court, her legal opinion talked about Hope Foster provided here sets out that we were in complete compliance with the laws. You could see from Hope's response that as far as we, I'm concerned and the board was concerned, we were bulletproof. She goes on to say that when Hope Foster and her team says we did everything in compliance, we relied on her for everything. So, Your Honor, if the advice had been given fully, reasonably, and accurately, the question of whether Mintz Levin would have stopped, excuse me, a therapeutic would have stopped is shown at least by inference that they stopped the very day that the special fraud alert was released in June of 2014. With respect to the question of whether there was any damage as a consequence of Mintz Levin's inadequate, unreasonable advice, Mr. Barger said that if Mintz Levin had given the advice to stop making the payments, self-report to the government and cooperate with the government's investigation of a false claim act, that after a text outcome would have been more beneficial to them than the force they took. Justice Harwood likewise said that under the DEFI standard, we don't have to quantify a specific number, but he likewise said that it would have been more beneficial to a therapeutic had they received the advice and followed the advice that Mr. Barger gave them than to follow the advice that was given by Mintz Levin. The real question to me that I've struggled with throughout this entire case is, is undisputed that Mintz Levin never told AtherTech to stop making the payments, but we've never heard a reason why Mintz Levin said that they should stop making the payments. The issue is that because Mintz Levin encouraged to make the payments, minimize the risk of making the payments, led the board to believe that they were bulletproof, go to the Department of Justice and report on your competitors that they're violating the law, all the while Mintz Levin knew that AtherTech was continuing to make those payments. Thank you, counsel. We understand your arguments. Court will be adjourned until tomorrow morning at 9 a.m. Central.